# The President's Power in the Field of Foreign Relations

The first section of this memorandum canvasses the historical precedents that delineate the President's prerogatives vis-à-vis Congress in foreign relations. These precedents tend to fall into one of two categories: those reflecting the Hamiltonian view that the President as Chief Executive has sole and unlimited authority to determine the nation's foreign policy, and those reflecting the Madisonian view that Congress as the law-making body has primary authority to determine the nation's foreign policy, which the President must take care to enforce.

The second section of this memorandum concludes that the power of the President to repel invasion is unquestioned. It would not be necessary to resolve the conflict between the Hamiltonian and Madisonian views in the event of an invasion, because statutes expressly provide that "whenever the United States shall be invaded or in imminent danger of invasion by any foreign nation," the President may use the military and naval forces to repel such invasion.

The third section of this memorandum discusses the application of the Neutrality Act of 1937 to the Spanish Civil War and the China-Japan conflict.

November 8, 1937

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL[*]

## I. The President as the Depositary of the Executive Power

> *It is important to bear in mind that we are here dealing . . . with . . . the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress . . . .—Mr. Justice Sutherland*

There are two major contentions regarding the extent of the President's power in the field of foreign relations:

(1) That the President, as the Chief Executive, has the sole and unlimited power—that his designation in the Constitution as the depositary of the Executive Power is, in itself, a source of power.

(2) That while the President as the Chief Executive is the sole spokesman of the nation in the field of foreign relations, the Congress as the law-making body may prescribe the policy to be followed, and the President in dealing with foreign nations must keep within that policy.

---

[*] Editor's Note: Some of the citations in the version of this memorandum that was transcribed in the Unpublished Opinions of the Assistant Solicitor General were missing, incomplete, or incorrect. We have endeavored to complete and correct these citations with sources that fit the proposition in text and were available at the time this memorandum was written.

The controversy between the exponents of these two views has existed since the beginning of our constitutional government. It reached bitter proportions during Washington's administration, with Alexander Hamilton championing the first position and James Madison championing the second. The occasion for their debate was the issuance by the President on April 22, 1793 of the proclamation of neutrality with respect to the war between certain nations, including Great Britain on the one part and France on the other. This proclamation was in direct conflict with the provisions of the treaty of alliance then existing between the United States and France, and as there was strong sentiment for France in this country at the time, the proclamation aroused severe criticism. It was charged that the President had failed in his constitutional duty to "take care that the laws be faithfully executed," in that he not only had failed to carry out the treaty but had committed the country to a policy in direct opposition to its terms.

In a series of articles signed "Pacificus,"[1] Hamilton came to the support of the President, justifying the action taken upon the ground that the President was the sole representative of the nation in its dealings with other nations, so that in this field no other arm of the government could interfere with or hamper his action. He took the position that in this field the President's power was supreme and unlimited, pointed out that the Constitution vests in the President *the Executive Power*, while it vests in the Congress only *such* legislative power as is *therein granted*. From this he argued that the executive power is complete except in so far as it is limited by the Constitution, and that the constitutional limitations must be strictly construed. He even inferred that the constitutional grant to the Congress of the power to declare war is not a limitation on the President's right to also exercise this strictly executive function, but that in this respect, the power granted to the Congress is concurrent with the inherent power of the President as the repository of *the Executive Power*.

Madison, at the request of Jefferson,[2] took issue with Hamilton and in a series of articles signed "Helvidius"[3] advanced the second contention set out above. He took the position that the President's powers, like those of the Congress, were strictly limited to those expressly granted by the Constitution and those necessarily implied therefrom, and that his duty "to take care that the laws be faithfully executed" required him to execute all laws enacted by the Congress including any bearing on the subject of foreign relations. He argued that the Constitution vested in Congress the exclusive right to regulate foreign commerce and to declare war, and that this was in direct conflict with Hamilton's views. He contended that if the President believed the laws as enacted by the Congress were improper or inade-

---

[1] 7 *The Works of Alexander Hamilton* 76–117 (John C. Hamilton ed., 1851).

[2] 7 *The Works of Thomas Jefferson* 436–37 (Paul Leicester Ford ed., 1904).

[3] 6 *The Writings of James Madison* 138–88 (Gaillard Hunt ed., 1906).

quate his power was exhausted when he had convened the Congress and communicated his views to that body.

Madison twitted Hamilton with inconsistency by quoting from an earlier article published in *The Federalist*, in which Hamilton had said:

> The history of human conduct does not warrant that exalted opinion of human virtue, which would make it wise in a nation to commit interests of so delicate and momentous a kind, *as those which concern its intercourse* with the rest of the world, to the *sole* disposal of a magistrate created and circumstanced as would be a president of the United States.[4]

Hamilton could well have retorted that Madison, in a speech to the House of Representatives in 1789, upon the question of the President's power to remove from office, had said:

> The constitution affirms, that the executive power shall be vested in the president. Are there exceptions to this proposition? Yes, there are. The constitution says that, in appointing to office, the senate shall be associated with the president, unless in the case of inferior officers, when the law shall otherwise direct. Have we a right to extend this exception? I believe not. If the constitution has invested all executive power in the president, I venture to assert, that the legislature has no right to diminish or modify his executive authority.[5]

It is thus apparent that neither Hamilton nor Madison, the two early exponents of the opposing theories, was at all times consistent in his views on the subject.

History discloses that Thomas Jefferson, likewise, was at times inconsistent. While Secretary of State under President Washington he wrote an opinion, at the request of the President, in which he said:

> The transaction of business with foreign nations is Executive altogether. It belongs, then, to the head of that department, except as to such portions of it as are specially submitted to the Senate. Exceptions are to be construed strictly.[6]

This statement by Jefferson has been often quoted by exponents of the Hamiltonian theory. It is to be remembered, however, that Madison's series of articles on the subject were written at Jefferson's request. Moreover, although Jefferson as

---

[4] *Id.* at 176 (quoting *The Federalist* No. 75) (emphasis added).

[5] *Quoted in* Edward S. Corwin, *The President's Control of Foreign Relations* 29 (1917).

[6] 3 *The Writings of Thomas Jefferson* 16 (Andrew A. Lipscomb & Albert Ellery Bergh eds., lib. ed. 1903).

President, without authority from Congress, sent the American fleet into the Mediterranean to wage war against Tripoli, after that fleet had engaged in a naval battle with the Tripolitan fleet he seemingly belied his authority for his action in a message to Congress of December 8, 1801, in which he said:

> Tripoli, the least considerable of the Barbary States, had come forward with demands unfounded either in right or in compact, and had permitted itself to denounce war, on our failure to comply before a given day. The style of the demand admitted but one answer. I sent a small squadron of frigates into the Mediterranean . . . with orders to protect our commerce against the threatened attack. . . . Our commerce in the Mediterranean was blockaded, and that of the Atlantic in peril. . . . One of the Tripolitan cruisers having fallen in with, and engaged the small schooner Enterprise . . . was captured, after a heavy slaughter of her men . . . . Unauthorized by the constitution, without the sanction of Congress, to go beyond the line of defence, the vessel being disabled from committing further hostilities, was liberated with its crew. The legislature will doubtless consider whether, by authorizing measures of offence, also, they will place our force on an equal footing with that of its adversaries. I communicate all material information on this subject, that in the exercise of the important function confided by the constitution to the legislature exclusively, their judgment may form itself on a knowledge and consideration of every circumstance of weight.[7]

Again, in the Louisiana Purchase, Jefferson acted first as only the broad theory of Hamilton would permit, and then left his deed to be ratified and paid for by the Congress. Afterwards in a letter to John Breckinridge, dated August 12, 1803, he declared:

> The Constitution has made no provision for our holding foreign territory, still less for incorporating foreign nations into our Union. The executive in seizing the fugitive occurrence which so much advances the good of their country, have done an act beyond the Constitution. The Legislature in casting behind them metaphysical subtleties, and risking themselves like faithful servants, must ratify and pay for it, and throw themselves on their country for doing for them unauthorized, what we know they would have done for themselves had they been in a situation to do it.[8]

---

[7] *Id.* at 328–29.

[8] 10 *Writings of Thomas Jefferson*, *supra* note 6, at 411.

Hamilton, in an article signed "Lucius Crassus," howsoever inconsistently with his own theory of the powers of the Chief Executive, caustically commented on both Jefferson's action and his message in the Tripolitan affair:

> The doctrine of the Message includes the strange absurdity, that without a declaration of war by Congress, our public force may destroy the life, but may not restrain the liberty, or seize the property of an enemy. This was exemplified in the very instance of the Tripolitan corsair. A number of her crew were slaughtered in the combat, and after she was subdued, she was set free with the remainder. . . . [A] perfect illustration of the unintelligible right, to take the life but not to abridge the liberty, or capture the property of an enemy. . . . The principle avowed in the Message, would authorize our troops to kill those of the invader, if they should come within reach of their bayonets, perhaps to drive them into the sea, and drown them; but not to disable them from doing harm, by the milder process of making them prisoners, and sending them into confinement. Perhaps it may be replied, that the same end would be answered by disarming, and leaving them to starve. The merit of such an argument would be complete by adding, that should they not be famished, before the arrival of their ships with a fresh supply of arms, we might then, if able, disarm them a second time, and send them on board their fleet, to return safely home.[9]

The controversy has continued. From time to time it has been the occasion of discussion in the public press and of debate in the Congress, few administrations having passed without the question being raised in one form or another. Andrew Jackson maintained that the designation of the President as the depositary of the Executive Power is, in itself, a source of power. Webster denied, without qualification, that the President has any powers except those specified in the Constitution. Chancellor Kent and Justice Story adopted the Hamiltonian view; Alfred Conkling rejected it. The names of prominent men who have kept the discussion alive, some in the support of one and some of the other view, are too numerous to mention here. Many recent articles in the public press and some debates in the last session of the Congress show that the question still is one upon which there is much difference of opinion.

So acute did the question become during Lincoln's administration that the House of Representatives in 1864 adopted a resolution declaring:

> That Congress has a constitutional right to an authoritative voice in declaring and prescribing the foreign policy of the United States, as

---

[9] 7 *The Works of Alexander Hamilton* 747–48 (John C. Hamilton ed., 1851).

well in the recognition of new Powers as in other matters; and it is the constitutional duty of the President to respect that policy not less in diplomatic negotiations than in the use of the national force when authorized by law; and the propriety of any declaration of foreign policy by Congress is sufficiently proved by the vote which pronounces it . . . .[10]

Sharp debate was heard on the question in the Senate in 1906. While participated in by many Senators, it was chiefly between Senator Spooner of Wisconsin and Senator Bacon of Georgia[11]—Senator Spooner supporting the broad theory of the President's powers and Senator Bacon advocating the opposite view. Many of the arguments advanced are reminiscent of those of Hamilton and Madison.

Senator Spooner, in the course of his argument quoted Mr. Justice Story as follows:

That a power so extensive in its reach over our foreign relations could not be properly conferred on any other than the executive department will admit of little doubt. That it should be exclusively confined to that department without any participation of the Senate in the functions (that body being conjointly intrusted with the treaty-making power) is not so obvious. Probably the circumstance that in all foreign governments the power was exclusively confined to the executive department, and the utter impracticability of keeping the Senate constantly in session, and the suddenness of the emergencies which might require the action of the Government, conduced to the establishment of the authority in its present form. It is not, indeed, a power likely to be abused, though it is pregnant with consequences often involving the question of peace or war.[12]

Senator Spooner also quoted from Professor Pomeroy as follows:

I repeat that the Executive Department, by means of this branch of its power over foreign relations, holds in its keeping the safety, welfare, and even permanence of our internal and domestic institutions. And in wielding this power it is untrammeled by any other department of the Government; no other influence than a moral one can

---

[10] Cong. Globe, 38th Cong., 2d Sess. 65–66 (Dec. 19, 1864).

[11] 40 Cong. Rec. 1417–31 (Jan. 23, 1906); 40 Cong. Rec. 2125–48 (Feb. 6, 1906).

[12] 40 Cong. Rec. 1420 (1906) (quoting 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1567 (5th ed. 1891)).

control or curb it; its acts are political, and its responsibility is only political.[13]

Senator Bacon, in support of the other view, said in part:

> The terms upon which foreign ships shall be allowed to enter our ports or do business with us is an important one in our foreign relations, but the power to fix and determine them is altogether with Congress.
>
> . . . .
>
> . . . It is entirely within the competency of Congress to pass a law that no citizen of a given country shall come to this country, that no goods shall be received from it, that no merchandise shall go from this country to it, that no letters shall come from it, that there shall be no intercommunication of any kind whatever. Who doubts the power of Congress to do so?
>
> In other words, it is within the power of Congress to absolutely sunder the relations between this country and any given foreign country. When that is said the whole thing is said; when that is said the whole argument is exhausted as to where rests the supreme power in foreign affairs, because the whole must include every part. If it is within the power of Congress to absolutely sunder all relations of every kind, commercial, social, political, diplomatic, and of every other nature, it is certainly within the power of Congress to regulate and control every question subsidiary to that and included within it. Congress and not the President is supreme under the Constitution in the control of our foreign affairs.
>
> . . . .
>
> Compared to this great array of sovereign powers granted to Congress, those conferred upon the President present a most striking contrast. He is clothed with the great power and responsibility of the execution of the laws, but beyond this the only prerogative of sovereignty with which he is exclusively invested is the pardoning power, and even that is denied to him in cases of impeachment by the House and conviction by the Senate.[14]

---

[13] *Id.* (quoting John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* § 672 (3d ed. 1875)).

[14] 40 Cong. Rec. 2132, 2134.

The broad powers which Hamilton declared to be vested in the Chief Executive have been exercised to a greater or lesser degree by many of the presidents. Washington's exercise of power in derogation of the treaty with France and Jefferson's actions in connection with the war with Tripoli and with the Louisiana Purchase have been noted heretofore. Other instances are the invasions of Mexico under Presidents Polk and Wilson; President McKinley's agreement with England, France, Italy, and Germany to suppress the Boxer Revolution and the sending of a joint expeditionary force into the heart of China; and President Theodore Roosevelt's action in connection with the Venezuela affair in 1901, and his armed assistance to Panama in its revolt against Columbia for the purpose of acquiring the Panama Canal Zone which he had been unable to acquire from Columbia. In all of these situations and in others of like character, the action taken was without authority from Congress, and that of Theodore Roosevelt in Panama was in direct conflict with the treaty with Columbia; yet in each instance the action met with the approval of the people and added to the prestige of the President.

In other instances Presidents have attempted to exercise similar powers without success. Notable examples are President Tyler's attempt to annex Texas in 1844; President Grant's attempt to annex Santo Domingo; and President Wilson's effort to make the United States a party to the League of Nations. On these and other occasions, the attempted exercise of broad powers was not approved by the people and the Presidents therefore failed of their purpose.

An outstanding example of the exercise of executive power in the field of foreign relations is to be found in the Monroe Doctrine. First promulgated by President Monroe in 1823, that Doctrine has been consistently adhered to and has been many times restated and reasserted. As sometimes interpreted, it is broad enough to constitute in advance a declaration of war against any European or Asiatic nation that attempts to interfere in the political affairs of any independent government on either of the American Continents. A few writers have attempted to justify it under the President's statutory authority to repel invasion or threatened invasion, but most have treated it as a purely executive declaration of the foreign policy of the United States. This Doctrine, unsupported for seventy-five years by any act of the Congress, has come to be almost, if not entirely, as much a part of our fundamental law as the Constitution itself. Daniel Webster said of it:

> I look upon it as a part of its treasures of reputation; and, for one, I intend to guard it. . . . I will neither help to erase it nor tear it out; nor shall it be, by any act of mine, blurred or blotted. It did honor to the sagacity of the government, and will not diminish that honor.[15]

President Cleveland referring to it said:

---

[15] *Quoted in* Elihu Root, *The Real Monroe Doctrine*, 199 N. Am. Rev. 841, 843 (1914).

> It may not have been admitted in so many words to the Code of International Law, but . . . it has its place in the Code of International Law as certainly and as securely as if it were specifically mentioned.[16]

And in 1920, in its "resolution of ratification" of the Treaty of Versailles, the Senate incorporated therein, among others, the following reservation:

> The United States will not submit to arbitration or to inquiry by the assembly or by the council of the League of Nations, provided for in said treaty of peace, any questions which in the judgment of the United States depend upon or relate to its long-established policy, commonly known as the Monroe Doctrine; said doctrine is to be interpreted by the United States alone and is hereby declared to be wholly outside the jurisdiction of said League of Nations and entirely unaffected by any provision contained in the said treaty of peace with Germany.[17]

While, as has been indicated, many Presidents have asserted the right to exercise the broad powers outlined by Hamilton, other Presidents have expressly disavowed this right. President Buchanan's special message to the Congress, dated February 18, 1859, in connection with Central American affairs is an example of such a disavowal.[18] That message called attention to the lawless conditions existing in Central America, to the harsh and unlawful treatment of citizens of the United States and to the arbitrary and unwarranted seizure and confiscation of United States vessels and cargoes in that section of the world. It then declared that the President, unlike the executives of foreign nations, was wholly without authority in his own right to take any action. It disavowed any right in the President, without authority from the Congress, to exert any force to correct conditions or to redress the many grievous wrongs that had been, and were continuing to be, perpetrated against United States citizens and their property, and expressly requested the Congress to grant the President that right.[19]

What a contrast between this action and the action of other Presidents under similar circumstances!

The divergent views of different Presidents on the extent of the executive power are further illustrated by a comparison of statements made by Presidents

---

[16] *Quoted in* Theodore S. Woolsey, *Monroe Doctrine Fundamentals*, 199 N. Am. Rev. 833, 834–35 (1914).

[17] 59 Cong. Rec. 4577.

[18] Special Message of the President on the Protection of the Transit Routes Across the Isthmus, *in The Messages of President Buchanan* 200 (J. Buchanan Henry comp., 1888).

[19] *Id.* at 201–02.

Theodore Roosevelt and William Howard Taft. Referring to his action in connection with the acquisition of the Panama Canal Zone, Mr. Roosevelt said:

> If I had followed traditional, conservative methods, I would have submitted a dignified state paper of probably two hundred pages to Congress and the debate on it would have been going on yet; but I took the Canal Zone and let Congress debate.[20]

Speaking in his autobiography of his action in 1905 in putting custom houses in Santo Domingo under American control, Mr. Roosevelt said:

> The Constitution did not explicitly give me power to bring about the necessary agreement with Santo Domingo. But the Constitution did not forbid my doing what I did. I put the agreement into effect, and I continued its execution for two years before the senate acted; and I would have continued it until the end of my term, if necessary, without any action by Congress. But it was far preferable that there should be action by Congress, so that we might be proceeding under a treaty which was the law of the land and not merely by a direction of the Chief Executive which would lapse when that particular executive left office. I therefore did my best to get the Senate to ratify what I had done.[21]

Mr. Roosevelt further said in his autobiography:

> The most important factor in getting the right spirit in my Administration, next to the insistence upon courage, honesty, and a genuine democracy of desire to serve the plain people, was my insistence upon the theory that the executive power was limited only by specific restrictions and prohibitions appearing in the Constitution or imposed by the Congress under its Constitutional powers. My view was that every executive officer, and above all every executive officer in high position, was a steward of the people bound actively and affirmatively to do all he could for the people, and not to content himself with the negative merit of keeping his talents undamaged in a napkin. I declined to adopt the view that what was imperatively necessary for the Nation could not be done by the President unless he could find some specific authorization to do it. My belief was that it was not only his right but his duty to do anything that the needs of the Nation demanded unless such action was forbidden by the Con-

---

[20] *Quoted in* Note, *Constitutional Law—Delegation of Powers—External Sovereignty*, 11 Temple L.Q. 418, 421 n.27 (1937).

[21] Theodore Roosevelt, *An Autobiography* 551 (1913).

stitution or by the laws. Under this interpretation of executive power I did and caused to be done many things not previously done by the President and the heads of the departments. I did not usurp power, but I did greatly broaden the use of executive power. In other words, I acted for the public welfare, I acted for the common well-being of all our people, whenever and in whatever manner was necessary, unless prevented by direct constitutional or legislative prohibition. I did not care a rap for the mere form and show of power; I cared immensely for the use that could be made of the substance.[22]

Mr. Taft, on the other hand, in his book *Chief Magistrate*, published after his retirement from office, said:

The true view of the Executive functions is, as I conceive it, that the President can exercise no power which cannot be fairly and reasonably traced to some specific grant of power or justly implied and included within such express grant as proper and necessary to its exercise. Such specific grant must be either in the Federal Constitution or in an act of Congress passed in pursuance thereof. There is no undefined residuum of power which he can exercise because it seems to him to be in the public interest, and there is nothing in the Neagle case and its definition of a law of the United States, or in other precedents, warranting such an inference. The grants of Executive power are necessarily in general terms in order not to embarrass the Executive within the field of action plainly marked for him, but his jurisdiction must be justified and vindicated by affirmative constitutional or statutory provision, or it does not exist.[23]

In the same book Mr. Taft, after quoting from President Roosevelt's autobiography the passage last quoted above, makes this statement:

My judgment is that the view of . . . Mr. Roosevelt, ascribing an undefined residuum of power to the President[,] is an unsafe doctrine and that it might lead under emergencies to results of an arbitrary character . . . .[24]

For many years the Supreme Court did not definitely take either side in the controversy. It did hold that in matters of foreign relations the judiciary had no authority, such matters being political in their nature and committed solely to the charge of the political authorities of the government; but it did not distinguish

---

[22] *Id.* at 388–89.

[23] William Howard Taft, *Our Chief Magistrate and His Powers* 139–40 (1916).

[24] *Id.* at 144.

between the Congress and the executive, nor designate which, if either, of these two political branches of the government had the higher authority.

Commentators on the subject cite many decisions of the Supreme Court as tending to support the one theory or the other. However, most decisions of that Court relating to matters in the field of foreign affairs, when carefully examined, involve both congressional and presidential action, and, therefore, involve some form of purported congressional delegation of power. Such decisions are not pertinent here, since the question, so far from being one of congressional delegation of power, is one of what powers the President may exercise without authority from Congress.

Of the decisions usually cited those in *Kansas v. Colorado*[25] and *In re Neagle*[26] have heretofore been most often relied upon by the exponents of the first mentioned theory, and that in *Little v. Barreme*[27] by the exponents of the second theory. These decisions, however, fall far short of being decisive of the question.

The decision in *Kansas v. Colorado* is much stressed by advocates of the Hamiltonian theory. That decision relates only to the powers of the judiciary, but in discussing and defining those powers the Court adopts much of the reasoning advanced by Hamilton in connection with the executive power, especially that based on the difference in the language of the several constitutional grants of powers.

The decision in the *Neagle* case is also urged in support of that theory. It holds that the President's duty to "take care that the laws be faithfully executed" is not "limited to the enforcement of acts of Congress or of treaties of the United States according to their *express terms*," but that it includes the "rights, duties, and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the Government under the Constitution[.]"[28] However, this part of the decision is dictum, since the court justified the action taken by the President in that case under an express congressional grant of authority.

The decision in *Little v. Barreme*, on the other hand, lends some comfort to the advocates of the Madisonian theory. Apparently it holds that in the field of foreign relations if the Congress has spoken, the President is controlled by the act of that body and by the policy prescribed thereby; but it seems to intimate, in a dictum, that if the Congress has not spoken the powers of the President as the Chief Executive are sufficient to enable him to meet any situation that may arise.[29]

---

[25] 206 U.S. 46 (1907).

[26] 135 U.S. 1 (1890).

[27] 6 U.S. (2 Cranch) 170 (1804).

[28] 135 U.S. at 64.

[29] 6 U.S. at 177–78.

The most recent and far reaching decision of the Supreme Court on the question is that in *United States v. Curtiss-Wright Export Corp.*[30] In that decision, rendered December 21, 1936, the Court held:

> The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs.[31]

It further held that the government has powers of sovereignty not granted by the Constitution—powers which prior to the Declaration of Independence were in the English crown; that these powers were wrested from the crown by the colonies collectively and not individually; and that when so wrested from the crown they vested, not in the individual colonies, but in the colonies as a unit. The Court declared that among such powers was the power to deal with foreign nations.

The Court further held in the *Curtiss-Wright* case that in foreign affairs "the President alone has the power to speak or listen as a representative of the nation," being the "'sole organ of the nation in its external relations'" and responsible only to the Constitution for his conduct.[32] It then said:

> It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.[33]

---

[30] 299 U.S. 304 (1936).

[31] *Id.* at 315–16.

[32] *Id.* at 319 (quoting 10 Annals of Cong. 613 (1800) (remarks of John Marshall)).

[33] *Id.* at 319–20.

It must be remembered, however, that the *Curtiss-Wright* case involved, not the question of the President's power to act without congressional authority, but the question of his right to act under and in accord with an act of Congress. In that case the constitutionality of the act under which the President had proceeded was assailed on the ground that it delegated legislative powers to the President. Much of the decision is dicta, and the *ratio decidendi* is contained in the following language:

> When the President is to be authorized by legislation to act in respect of a matter intended to affect a situation in foreign territory, the legislator properly bears in mind the important consideration that the form of the President's action—or, indeed, whether he shall act at all—may well depend, among other things, upon the nature of the confidential information which he has or may thereafter receive, or upon the effect which his action may have upon our foreign relations. This consideration, in connection with what we have already said on the subject, discloses the unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed. As this court said in *Mackenzie v. Hare*, 239 U.S. 299, 311 [(1915)], "As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. *We should hesitate long before limiting or embarrassing such powers.*" (Italics supplied.)[34]

It is apparent, therefore, that the case leaves much of the controverted question still unsettled. It places internal and external affairs in separate categories, and holds that the strict rule applied by the court to congressional delegations of power to the President in connection with internal affairs does not apply to such delegations of power in connection with external affairs. It intimates that the President might act in external affairs without congressional authority, but it leaves undecided the question whether the Congress can enact a statute in derogation of the President's power in this field—for example, a mandatory embargo or neutrality act—which question involves the further question whether the President may, in dealing with foreign nations, entirely disregard a statute which the Congress has enacted, and which prescribes a policy to be followed.

On this point the decision of the Supreme Court in *Little v. Barreme* is of interest, and perhaps of importance. As before stated, it intimates that when the Congress has not spoken the President's powers over foreign affairs are unlimited, but apparently holds that when the Congress has spoken, his powers are limited to

---

[34] *Id.* at 321–22.

the policy declared by the act of the Congress. Whether the Court would today hold this to be a correct statement of the law, or even the correct interpretation of its former decision, is a matter of conjecture.

In view of what has been said, it is apparent that from the beginning the question of the extent of the President's powers has been a controversial one, and that the answer to the question is to be found in the statement of Chief Justice Marshall in *Marbury v. Madison*:

> [T]he president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.[35]

In any government, the exercise of political powers is dependent upon the will of the sovereign. In the United States the people constitute the sovereign, and therefore the successful exercise of any political power by the executive is dependent upon public opinion. For this reason it is doubtful if the question of the extent of the President's powers ever will be definitely determined. Public opinion is changeable; it may favor one thing today and another tomorrow. Therefore, the power which the public will permit the executive to exercise will vary from time to time according to the circumstances involved.

Like Hamilton and Madison, the average man is never consistently either a strict or a liberal constructionist. He views the Constitution and the government merely as instruments through which he may on the one hand secure the performance of those acts of which he approves and on the other prevent the performance of those acts of which he does not approve. Therefore, if the act sought to be done is one of which the general public approves it will accept any construction, however liberal, which permits the act to be done; but if the act is one of which it does not approve, it will accept any construction, however restricted, which prevents the act from being done.

This was strikingly illustrated during the Wilson administration. When President Wilson, without any authority from the Congress, seized Vera Cruz, and when he later sent an expeditionary force into Mexico, despite criticism in many quarters, the public generally approved those actions. But when later he took the leadership in establishing the League of Nations and in his dealings with European countries practically committed the United States to participation therein, public approval perceptibly waned and the Senate rejected the treaty. As a result thereof the President's prestige was greatly impaired, with consequences injurious to his political influence and to his health.

It follows that a President today, in the performance of an act of which the general public approves, may assume and exercise a power with the approbation

---

[35] 5 U.S. (1 Cranch) 137, 165–66 (1803).

of the public; but tomorrow, in the performance of some act of which the public does not approve, he will exercise the same or a like power at his peril.

The question must be considered realistically. It is essentially practical and does not admit of a legalistic treatment that fails to take into account human nature in the individual and in the mass. If it be shocking to legal concept to conclude that a President at one time under the Constitution has the power to do an act in respect of foreign relations, and that the same or another President under the same Constitution has not the power to do such an act at another time, the trouble is not with the conclusion but with the concept. History corroborates the conclusion, while at the same time overturning any legal theory on the subject that does not accord with experience. Even when Conkling was bitterly attacking President Johnson for assuming unwarranted executive power he said:

> It is not like the assumption of a questionable power from good motives and for beneficent ends; . . . where the acquiescence of the nation may rightly be held a practical sanction and affirmation of the power.[36]

Presidents will continue in the future to draw their executive power respecting foreign relations from the Constitution, as they have done in the past, and to exercise it. When the people approve the exercise, the existence of the power under the Constitution will be proved; when they disapprove the exercise, the existence of the power under the Constitution will be disproved. In this sphere, indeed, "The event is a great teacher." The theory of Hamilton and the theory of Madison have been debated continuously—and the argument will persist. The two views have not been and cannot be reconciled in the realm of logic; in the practical world they converge. In the field of foreign relations, the Chief Executive moves in a zone of twilight[*] where he may proceed with assurance of his powers under the Constitution only when the people follow and approve. As said by Woodrow Wilson:

---

[36] Alfred Conkling, *The Powers of the Executive Department of the Government of the United States* 134–35 (1866) (emphasis supplied).

[*] Editor's Note: Fifteen years later, Justice Robert Jackson used the same phrase—"a zone of twilight"—in his famous Steel Seizure Case concurrence, albeit in more specific reference to cases in which Congress has not spoken to a matter of foreign affairs but the President nevertheless determines to take action. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) ("When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law."). In 1937, when Assistant Solicitor General Bell wrote this opinion, Jackson was the Assistant Attorney General for the Antitrust Division. In March 1938, Jackson was appointed Solicitor General; and in January 1940 he was appointed Attorney General of the United States.

If he [the President] rightly interpret the national thought and boldly insist upon it, he is irresistible.[37]

## II. The President's Power to Repel Invasion

*Better to be awakened by the alarm-bell than to perish in the flames.—Burke*

Closely related to the subject discussed under Part I is the power of the President to repel invasion. That power is unquestioned. The exponents of the Hamiltonian theory contend that the power, without statutory authority, would be inherent in the President as the Chief Executive; but it is not necessary to rely on this view, since the statutes expressly provide that "whenever the United States shall be invaded or in imminent danger of invasion by any foreign nation," the President may use the military and naval forces to repel such invasion.

In the *Prize Cases*, the Supreme Court said:

> But by the Acts of Congress . . . he is authorized to call[] out the militia and use the military and naval forces of the United States in case of invasion by foreign nations, and to suppress insurrection against the government of a State or of the United States.
>
> If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority.[38]

In *Martin v. Mott*, the Supreme Court took a somewhat broader view of this power of the President. In that case Justice Story, speaking for the Court, said:

> For the more clear and exact consideration of the subject, it may be necessary to refer to the constitution of the United States, and some of the provisions of the act of 1795. The constitution declares, that congress shall have power "to provide for calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions": and also "to provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States." In pursuance of this authority, the act of 1795 has provided, "that whenever the United States shall be invaded, or be in imminent danger of invasion from

---

[37] Woodrow Wilson, *Constitutional Government in the United States* 68 (1908).

[38] 67 U.S. (2 Black) 635, 668 (1862).

any foreign nation or Indian tribe, it shall be lawful for the president of the United States to call forth such number of the militia of the state or states most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and to issue his order for that purpose to such officer or officers of the militia as he may think proper." And like provisions are made for the other cases stated in the constitution. It has not been denied here, that the act of 1795 is within the constitutional authority of congress, or that congress may not lawfully provide for cases of imminent danger of invasion, as well as for cases where an invasion has actually taken place. In our opinion, there is no ground for a doubt on this point, even if it had been relied on, for the power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion, as the necessary and proper means to effectuate the object. One of the best means to repel invasions is to provide the requisite force for action, before the invader himself has reached the soil.

The power thus confided by congress to the president, is, doubtless, of a very high and delicate nature. A free people are naturally jealous of the exercise of military power; and the power to call the militia into actual service, is certainly felt to be one of no ordinary magnitude. But it is not a power which can be executed without a correspondent responsibility. It is, in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion. If it be a limited power, the question arises, by whom is the exigency to be judged of and decided? Is the president the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the president are addressed, may decide for himself, and equally open to be contested by every militiaman who shall refuse to obey the orders of the president? We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the president, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of congress. The power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union. . . .

If we look at the language of the act of 1795, every conclusion drawn from the nature of the power itself, is strongly fortified. The words are, "whenever the United States shall be invaded, or be in

imminent danger of invasion, &c., it shall be lawful for the president, &c., to call forth such number of the militia, &c., as he may judge necessary to repel such invasion." The power itself is confided to the executive of the Union, to him who is, by the constitution, "the commander-in-chief of the militia, when called into the actual service of the United States," whose duty it is to "take care that the laws be faithfully executed," and whose responsibility for an honest discharge of his official obligations is secured by the highest sanctions. He is necessarily constituted the judge of the existence of the exigency, in the first instance, and is bound to act according to his belief of the facts.[39]

The use in the statutes and decisions of the term "imminent danger of invasion" raises another question. Assuming that the President's power to use force against a foreign nation is limited to his statutory power to repel an "invasion" or an "imminent danger of invasion," what constitutes an "imminent danger of invasion"? Under what circumstances may the President act, and how far may he go, under his authority to meet an "imminent danger of invasion"?

As mentioned in Part I of this memorandum, the Monroe Doctrine has sometimes been justified under the powers of the President to repel threatened invasions; but if this power be the sole justification for the Monroe Doctrine, how far may it be extended under present conditions? If at the time the Monroe Doctrine was announced—the day of coach by land and sail by sea—the interference of a foreign nation in South American affairs constituted a threat of invasion of the United States, what is necessary to constitute such a threat today in the world of the airplane and the submarine? In the light of present means of rapid transportation and destructive warfare, how far is the President justified in finding in military preparations and activities by foreign nations threat of invasion? Do the military activities and demonstrations of Japan, for example, constitute a threat of invasion of the Philippine Islands or of Hawaii? Could there be sufficient military developments and demonstrations on islands in the Pacific or Atlantic or on the European or the Asiatic Continent to constitute such a threat?

Moreover, what does the term "invasion" embrace? Is it limited to territorial invasion, or does it comprehend, also, invasion of the rights of this country as a sovereign nation, wherever committed?

Again, attention is called to President Jefferson's message to Congress in connection with the Tripolitan affair. Jefferson justified the action taken on the ground that he had sent the fleet to the Mediterranean "with orders to protect our commerce against the threatened attack."[40] Since, in the same document, he disclaimed

---

[39] 25 U.S. (12 Wheat.) 19, 27–30, 31 (1827).

[40] 3 *Writings of Thomas Jefferson*, *supra* note 6, at 328.

any authority to act without authority from the Congress, perhaps he deemed his statutory authority to repel invasion or threatened invasion as sufficient authority.

The real answer here, also, is that the determination of when there is invasion or imminent danger of invasion and power to deal with the subject are political questions which can be resolved only through the exercise of the President's judgment supported by the will of the people. Woodrow Wilson said:

> [The President] may be both the leader of his party and the leader of his nation, or he may be one or the other. If he lead the nation, his party can hardly resist him. His office is anything he has the sagacity and force to make it.[41]

And as stated by Justice Story in *Martin v. Mott*:

> It is no answer, that such a power [the power to provide against the danger of invasion] may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the constitution itself. In a free government, the danger must be remote, since, in addition to the high qualities which the executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny.[42]

### III. The President's Position in the Far Eastern and Spanish Affairs as Affected by the Neutrality Act of 1937

*The transaction of business with foreign nations is Executive altogether.—Jefferson*

If the Hamiltonian theory of the President's powers be accepted in its broadest sense, the Neutrality Act of 1937 may be treated by him as advisory only, to be put into effect or not at a particular time as he may determine to be for the best interests of the country. If the Madisonian view be adopted, however, even with material qualifications, the Neutrality Act binds the President and makes it his constitutional duty to "take care" that it is enforced.

---

[41] *Constitutional Government*, *supra* note 37, at 69.

[42] 25 U.S. at 32.

Since considerable misapprehension has appeared in the public press with respect to the effect of the Neutrality Act of 1937[43] upon prior existing treaties entered into between this country and foreign nations, it is to be observed at the outset that it is settled by the decisions of the Supreme Court that under the Constitution both treaties and acts of Congress are the supreme law of the land; that neither is superior to the other; and that in case of conflict, that which is later in date controls.[44] It follows that to the extent that the Neutrality Act of 1937 conflicts with any prior treaty, the treaty is abrogated by the Act. The legislative history of the Act is in accord with this doctrine.

During the session at which the Joint Resolution of February 29, 1936[45] was adopted, the House Committee on Foreign Affairs had reported a resolution (H.J. Res. 422) containing the following section:

> SEC. 16. If the President shall find that any of the provisions of this Act, if applied, would contravene treaty provisions in force between the United States and any foreign country before such provisions shall become applicable as to such foreign country or countries, he shall enter into negotiations with the government of such country for the purpose of effecting such modification of the treaty provisions as may be necessary, and if he shall be unable to bring about the necessary modifications, he may in his discretion, but before such provisions shall become applicable as to such foreign country or countries he shall give notice of termination and terminate the treaty in accordance with the terms thereof.

In connection therewith the Committee's report stated:

> Section 16. This section has created quite an argument in your committee, on the question as to whether or not any of the provisions of this bill would violate any treaties between the United States and any foreign countries. While this section provides that if the President shall find that any of the provisions of this act, if applied, would contravene treaty provisions in force between the United States and any foreign country, he may enter into negotiations with the government of such country for the purpose of effecting such modification of the treaty provisions which will be necessary, and if he shall be unable to bring about the necessary modifications, he may, in his discretion, give notice of the termination of the treaty. Many of our

---

[43] 50 Stat. 121.

[44] *See Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox Ltd.*, 291 U.S. 138, 160 (1934); *Cook v. United States*, 288 U.S. 102, 118–19 (1933); *Ex Parte Webb*, 225 U.S. 663, 683 (1912); *Head Money Cases*, 112 U.S. 580, 597–99 (1884).

[45] 49 Stat. 1152.

> treaties with European countries have a provision of 1 year's notice of termination. The committee is very anxious to see that no treaty rights are violated . . . .[46]

The Committee later abandoned this more liberal resolution and reported a substitute resolution, which became the Joint Resolution of February 29, 1936. The Committee's report[47] made no explanation of the change of position but Chairman McReynolds explained on the floor of the House that a compromise had been necessary.[48] The Committee was accused of "retreat and surrender," and "abandonment of everything that committee stood for."[49] During the consideration of the substitute resolution in the House and in the Senate there was no mention of the question of the effect of the resolution on treaties. The Joint Resolution of February 29, 1936 was substantially reenacted in section 1 of the Neutrality Act of 1937.

### A. The Spanish Situation

Section 1(c) of the Neutrality Act of 1937 provides as follows:

> Whenever the President shall find that a state of civil strife exists in a foreign state and that such civil strife is of a magnitude or is being conducted under such conditions that the export of arms, ammunition, or implements of war from the United States to such foreign state would threaten or endanger the peace of the United States, the President shall proclaim such fact, and it shall thereafter be unlawful to export, or attempt to export, or cause to be exported, arms, ammunition, or implements of war from any place in the United States to such foreign state, or to any neutral state for transshipment to, or for the use of, such foreign state.[50]

Acting under that provision, the President on May 5, 1937 found and proclaimed that

> a state of civil strife unhappily exists in Spain and that such civil strife is of a magnitude and is being conducted under such conditions that the export of arms, ammunition, or implements of war from the

---

[46] H.R. Rep. No. 74-1928, at 8 (1936).

[47] H.R. Rep. No. 74-2001 (1936).

[48] 80 Cong. Rec. 2240 (1936).

[49] *Id.* at 2241.

[50] 50 Stat. at 121–22.

> United States to Spain would threaten and endanger the peace of the United States . . . .[51]

It is thus obvious that the President, with ample justification for his finding, followed, with respect to the civil strife existing in Spain, precisely the course which he was authorized by the Congress to take.

Under the facts any criticism of the President's action in this situation cannot be directed fairly to any unwarranted assumption of power. Nor can fault be found properly on the ground that circumstances in Spain did not justify his finding—everyone knows that they did, and in any event, the Congress left it to the President's sole discretion to judge whether the facts in a given situation justify such a finding and proclamation.

For the reason stated above, any earlier treaty with Spain inconsistent with the Neutrality Act of 1937 was abrogated by that Act and the President's action under it, to the extent of the inconsistency.

### B. The Far Eastern Situation

Section 1(a) of the Neutrality Act of 1937 provides as follows:

> Whenever the President shall find that there exists a state of war between, or among, two or more foreign states, the President shall proclaim such fact, and it shall thereafter be unlawful to export, or attempt to export, or cause to be exported, arms, ammunition, or implements of war from any place in the United States to any belligerent state named in such proclamation, or to any neutral state for transshipment to, or for the use of, any such belligerent state.[52]

The President has not yet found under this section "that there exists a state of war between" China and Japan. Irrespective of whether the provisions of section 1 are mandatory, requiring the President to find the existence of a state of war when in fact it does exist, or discretionary, leaving it to him, when there exists a state of war, to determine whether and when he shall make a finding of its existence so as to make the Neutrality Act applicable to it, his position in not having made a finding that a state of war exists between China and Japan is fully justified, notwithstanding that to many people the existence of war in China is an accepted fact.

Japan has not formally declared war on China, nor has China formally declared war on Japan. So far has each refrained from that course, that diplomatic relations between the two countries have not even been severed but continue as in time of

---

[51] 2 Fed. Reg. 776, 777.

[52] 50 Stat. at 121.

peace, each maintaining in the country of the other an ambassador and consuls, thus indicating that neither conceives that war exists between them. While diplomatic relations are often severed before war begins, the existence of diplomatic relations after the commencement of war would be novel. Moreover, no neutral nation has formally recognized the existence of a state of war as between China and Japan. Other circumstances inconsistent with a finding that there exists a state of war between these two nations are that the Japanese blockade is not that of a belligerent, being directed only against Chinese vessels, and that the United States and other countries continue to harbor their warships in Chinese waters, and to rescue and repatriate their nationals, as they could not do in case of war between the two nations.

Should the President find that there exists a state of war between China and Japan, this nation would become the first to characterize the conflict between them as war. Such a finding on the part of the President would have the effect of causing the Neutrality Act to abrogate the commerce features of the Nine Power Treaty—a result not lightly to be contemplated—while so long as he refrains, the Act and the Treaty are not in conflict and both are fully effective. Such a course would be tantamount to a declaration of war by this country between those two nations, notwithstanding that neither has formally declared war on the other and might well cause one or both to do so, to say nothing of causing repercussions among the other countries of the world, and such complications as would greatly lessen the possibilities of a peaceful solution of the difficulties involved— particularly through the influence of the United States. While the Neutrality Act does not disclose whether the President shall find that there exists a state of war only when there has been a formal declaration as between two nations, or also when a de facto state of war exists, the existing situation in the Far East is such that on either construction the course so far pursued by the President is sound and within his authority under the Act for the reasons heretofore indicated.

As to whether, when there exists a state of war, the Neutrality Act is mandatory upon the President to find its existence, the position may be taken that the act by its terms leaves to the President the discretion to find or not to find the existence of a state of war—or at least the discretion as to *when* to make a finding. This, however, would be a strained construction and not borne out by the legislative history of the Act.

The President at the time he approved the Neutrality Act of 1936 indicated by his statement that the provisions of section 1 were too inflexible, saying:

> The latter section terminates at the end of February 1936. This section requires further and more complete consideration between now and that date. Here again the objective is wholly good. It is the policy of this Government to avoid being drawn into wars between other nations, but it is a fact that no Congress and no Executive can foresee all possible future situations. History is filled with unfore-

seeable situations that call for some flexibility of action. It is conceivable that situations may arise in which the wholly inflexible provisions of Section 1 of this Act might have exactly the opposite effect from that which was intended. In other words, the inflexible provisions might drag us into war instead of keeping us out. The policy of the Government is definitely committed to the maintenance of peace and the avoidance of any entanglements which would lead us into conflict.[53]

Upon this phase of the matter Congressman Johnson of the House Committee on Foreign Affairs, in explanation of the Joint Resolution of February 29, 1936, made the following explanation:

> Someone expressed opposition to the bill because it was not mandatory and delegated authority to the President. Five of its prohibitions are mandatory and the President has no discretion whatever, and only the two relating to the use of American ports by submarines and the travel of Americans on belligerent vessels are left to the President's discretion, and even in these the delegation of discretion is so circumscribed that it is practically mandatory, since he is required to act if either of a number of contingencies therein mentioned should arise.[54]

The mandatory provisions of that Resolution were reenacted as section 1 of the Joint Resolution of May 1, 1937,[55] without pertinent change of language. It seems clear, therefore, from the language of the Act and from its legislative history, that as to section 1(a) the Congress did not intend to leave anything to the discretion of the President, and did intend that the provisions of that section should be mandatory on him when it came to his knowledge that a state of war existed. The express granting of discretion in connection with section 1(c) emphasizes this construction.

Since the Act does not operate on a given situation until the President makes a finding, it always lies within his *power*, when there exists a state of war, so to find or not to find. He could not be fairly criticized, certainly, for not making such a finding until after the lapse of a reasonable time, under the circumstances, after the commencement of a state of war. In any view, he would be entitled to such a reasonable time to investigate, consider, come to his conclusion, and act. Should he delay, however, beyond such a reasonable time, he could justify his negative action only if the delay should meet with popular approval. Should there be,

---

[53] *Quoted in* Allen W. Dulles & Hamilton Fish Armstrong, *Can We Be Neutral?* 150 (2d ed. 1936).

[54] 80 Cong. Rec. 2245.

[55] 50 Stat. 121.

instead, popular disapproval, his position (even if placed on the Hamiltonian view) would be difficult to defend. These considerations would become pressing in the event that Japan should formally declare war on China.

Another position which has been suggested is that the Neutrality Act of 1937 contemplates a finding that there exists a state of war only when there has been a *formal* declaration of war, and not in case of any de facto war. It is true that the practice of the Roman Empire was not to recognize the existence of a state of war until war had been formally declared; but that procedure fell into early disuse, and for many centuries it was the general custom not to formally declare war. The Supreme Court has declared that a state of war may exist without a formal declaration of war.[56]

The Second Hague Conference of 1907, in its Convention III, contains provisions looking toward reestablishment of the Roman practice:

### Article 1

The contracting Powers recognize that hostilities between themselves must not commence without previous and explicit warning, in the form either of a reasoned declaration of war or of an ultimatum with conditional declaration of war.

### Article 2

The existence of a state of war must be notified to the neutral Powers without delay, and shall not take effect in regard to them until after the receipt of a notification, which may, however, be given by telegraph.[57]

But the effort was rendered largely nugatory by the last clause of Article 2, which provides:

Neutral Powers, nevertheless, cannot rely on the absence of notification if it is clearly established that they were in fact aware of the existence of a state of war.[58]

The modern tendency seems to be for nations not to make formal declarations of their wars, and the suggested construction of the Act as contemplating a finding

---

[56] *The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862); *Bas v. Tingy (The Eliza)*, 4 U.S. (4 Dall.) 37, 40–41 (1800) (opinion of Washington, J.); *Miller v. United States*, 78 U.S. (11 Wall.) 268, 306 (1870); *The Pedro*, 175 U.S. 354, 363 (1899).

[57] Hague Convention (III) Relative to the Opening of Hostilities, Oct. 18, 1907, 36 Stat. 2259, 2271.

[58] *Id.*

by the President only in case of formally declared war is highly technical and unconvincing.

A practical course which the President may see fit to follow is that set by President Wilson in connection with the arming of American merchant vessels just prior to our entrance into the World War. On February 25, 1917, he went before the Congress and asked its approval of his decision to authorize merchant ships to carry defensive arms and to use them in the protection of lives and property in their legitimate and peaceful pursuits at sea. President Wilson said in part:

> No doubt I already possess that authority without special warrant of law, by the plain implication of my constitutional duties and powers; but I prefer in the present circumstances not to act upon general implication. I wish to feel that the authority and the power of the Congress are behind me in whatever it may become necessary for me to do. We are jointly the servants of the people and must act together and in their spirit, so far as we can divine and interpret it.[59]

So here, the President might submit the instant situation to the Congress in a message sufficiently setting forth the facts to show the serious complications involved and the undesirable results likely to flow from precipitate steps, together with an outline of such plan of action as he may wish to propose, requesting the Congress to cooperate with the Executive in dealing with the crisis.

Such a course would tend to abate any criticism of the President because he has not or does not find under section 1(a) of the Neutrality Act that there exists a state of war between China and Japan, and does not say why he fails to do so. It may be peculiarly adapted to the situation which will exist should Japan formally declare war on China. Should the policy outlined by the President in such a message meet with popular approval its purposes would be accomplished.

*The law is the general will . . . .—Volney*

GOLDEN W. BELL
*Assistant Solicitor General*

---

[59] *Quoted in* Corwin, *supra* note 5, at 152.

APPENDIX

## Authorities Consulted

American Historical Review, vol. 23, no. 1, p. 868 (1917–18).

American Political Science Review, vol. 12, p. 324 (1918).

Armstrong, Hamilton Fish & Allen W. Dulles, *Can We Be Neutral?* (2d ed. 1936).

Brooklyn Law Review, vol. 6, no. 3, pp. 382–85 (Mar. 1937).

Carnegie Endowment for International Peace, Division of International Law, Pamphlet Series No. 12, *The Hague Convention (III) of 1907 Relative to the Opening of Hostilities* (1915).

Chambrun, Adolphe de, *The Executive Power in the United States: A Study of Constitutional Law* (1874).

Columbia Law Review, vol. 36, no. 7, p. 1162 (Nov. 1936).

Conkling, Alfred, *The Powers of the Executive Department of the Government of the United States* (1866).

Corwin, Edward S., *The President's Control of Foreign Relations* (1917).

Dulles, Allen W. & Hamilton Fish Armstrong, *Can We Be Neutral?* (2d ed. 1936).

Elliot, Jonathan, *Journal and Debates of the Federal Convention*, vol. 4 (1830).

Fordham Law Review, vol. 6, no. 2 (May 1937).

Georgetown Law Journal, vol. 25, no. 3, pp. 738–40 (Mar. 1937).

George Washington Law Review, vol. 5, no. 2, p. 271 (Jan. 1937).

Hamilton, Alexander, *The Works of Alexander Hamilton*, vol. 7 (John C. Hamilton ed., 1851).

Harvard Law Review, vol. 50, no. 4, p. 691 (Feb. 1937).

Hershey, Amos S., *The International Law and Diplomacy of the Russo-Japanese War* (1906).

Hudson, Manley O., *International Legislation*, vol. 3 (1931).

Hyde, Charles Cheney, *International Law, Chiefly as Interpreted and Applied by the United States*, vol. 2 (1922).

Jefferson, Thomas, *The Writings of Thomas Jefferson*, vols. 3, 9, and 10 (Andrew A. Lipscomb ed., mem. ed. 1903–04).

Latané, John Halladay, *A History of American Foreign Policy* (1927).

MacDonald, William, *Select Documents Illustrative of the History of the United States, 1776–1861* (1930).

Madison, James, *Letters and Other Writings of James Madison*, vol. 1 (1865).

Matthews, John Mabry, *The Conduct of American Foreign Relations* (1922).

Maryland Law Review, vol. 1, no. 2, pp. 167–71 (Feb. 1937).

Moore, John Bassett, *A Digest of International Law*, vol. 7 (1906).

North American Review, vol. 199 (1914).

Oppenheim, Lassa, *International Law*, vol. 2 (A.D. McNair ed., 4th ed. 1926).

Phillipson, Coleman, *International Law and the Great War* (1915).

Pomeroy, John Norton, *An Introduction to the Constitutional Law of the United States* (7th ed. 1883).

Reinsch, Paul S., *Readings on American Federal Government* (1909).

St. John's Law Review, vol. 11, no. 2 (Apr. 1937).

Savage, Carlton, *Policy of the United States Toward Maritime Commerce in War*, vol. 2 (1934).

Taft, William Howard, *The Presidency: Its Duties, Its Powers, Its Opportunities and Its Limitations* (1916).

Temple Law Quarterly, vol. 11, no. 3, pp. 418–21 (Apr. 1937).

Warren, Charles, *Presidential Declarations of Independence* (1930).

Wheaton, Henry, *Wheaton's Elements of International Law*, vol. 2 (A. Berriedale Keith ed., 6th English ed. 1929).

Willoughby, Westel W., *The Constitutional Law of the United States*, vol. 1 (2d ed. 1929).

White, Howard, *Executive Influence in Determining Military Policy in the United States* (1925).

Wright, Quincy, *The Control of American Foreign Relations* (1922).

Yale Law Journal, vol. 16, no. 1, pp. 6–24 (Nov. 1906).

Yale Law Journal, vol. 25, no. 8, pp. 599–616 (June 1916).